709 F.2d 959
 CNG PRODUCING CO. and Forest Oil Corp., Individually and on
Behalf of Columbia Gas Development Corp. and Texas
Gas Exploration Corp., Plaintiffs-Appellants,
v.
COLUMBIA GULF TRANSMISSION CORP. and Texas Gas Transmission
Corp., Defendants- Appellees.
 No. 82-3274.
 United States Court of Appeals,
Fifth Circuit.
 July 18, 1983.
Opinion on Denial of Rehearing Nov. 3, 1983.
 
 Doyle, Smith & Doyle, Roger H. Doyle, Constance R. LeSage, James E. Wright, Jr., New Orleans, La., for plaintiffs-appellants.
 Brian, Simon, Peragine, Smith & Redfearn, Frank J. Peragine, Daniel J. Caruso, Thomas J. Fischer, New Orleans, La., Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Kathleen M. Overcash, Lafayette, La., for defendants-appellees.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before GEE, REAVLEY and HIGGINBOTHAM, Circuit Judges.
 REAVLEY, Circuit Judge:
 
 
 1
 Plaintiff-appellants sued the defendant-appellees for damages to their oil platform occasioned by an explosion occurring while defendants were venting natural gas. The jury returned a verdict for defendants, and we affirm.
 
 THE FACTS
 
 2
 Plaintiffs are the owner-operators of an offshore oil platform located off the coast of Louisiana.[1] Defendants Texas Gas Transmission Corp., a purchaser of the platform's natural gas, and Columbia Gulf Transmission Co. (Columbia Gulf) maintain a metering station on the platform to verify the quantity of gas purchased. This "metering station" is located approximately ten feet from the platform's living quarters, and underneath a heliport on top of the living quarters.
 
 
 3
 On July 20, 1979, a Columbia Gulf crew came to the platform to perform certain repairs on the gas pipelines. This required defendants to vent the gas in the metering station into the air. Columbia Gulf commenced the venting or "blow-down" operation by releasing the gas through a valve on a four inch pipe. Because the valve pointed up and struck a mercury vapor lamp that was still on, and because gas was accumulating under the overhanging heliport, the Columbia Gulf crew shut-down the venting operation. Once the light was turned off, the crew resumed venting, but again stopped because of the accumulation of gas. The crew then decided to use the valves on two 2-inch lines instead of the four inch line. One of these valves pointed away from the platform, but the other still pointed up towards the heliport. A short time thereafter an explosion and fire occurred, apparently caused by the accumulation of gas and a spark from an exhaust fan left on in the living quarters.
 
 
 4
 The district court submitted three interrogatories to the jury. These interrogatories inquired as to a defect in defendants' metering station, defendants' negligence in the venting operations, and plaintiffs' contributory negligence. The jury answered all three interrogatories affirmatively, and the district court entered judgment on the verdict. Plaintiffs appeal, alleging that the district court erred in not submitting interrogatories regarding: (1) strict liability for ultrahazardous activity; (2) strict liability under La.Civ.Code Ann. art. 2317 (West 1979) [hereinafter article 2317]; (3) products liability; and (4) last clear chance. Plaintiffs also argue that if contributory negligence is a defense to any of their claims, the defendants' duty extended to protecting the plaintiffs from their own contributory negligence, so that the plaintiffs' claims are not precluded by the jury's findings. We treat these arguments separately.
 
 I. Ultrahazardous Activities
 
 5
 Plaintiffs argue that the venting of natural gas is an ultrahazardous activity which imposes strict liability upon the defendants. They rely on Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133 (1971) for this proposition.
 
 
 6
 In Langlois, the defendant was held strictly liable for the storage of poisonous gas. The court stated:
 
 
 7
 The storage of the dangerous, highly poisonous gas by Allied was an activity which, even when conducted with the greatest of care and prudence, could cause damages to others .... It was an ultra-hazardous activity ....
 
 
 8
 258 La. at 1083, 249 So.2d at 139. Our plaintiffs argue that the venting of flammable natural gas into the atmosphere is for all intents and purposes the same as the accidental leakage of poisonous gas in Langlois.
 
 
 9
 The Louisiana Supreme Court in Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982), recently discussed ultrahazardous activities, stating:
 
 
 10
 There are some activities in which the risk may be altogether reasonable and still high enough that the party ought not undertake the activity without assuming the consequences. Such activities include pile driving, storage of toxic gas, blasting with explosives, crop dusting with airplanes, and the like, in which the activity can cause injury to others, even when conducted with the greatest prudence and care.
 
 Id. at 498. The court went on to explain:
 
 11
 The activity of driving piles, for example, is likely to cause damage, even when there is no substandard conduct on anyone's part. The activity, by its very nature, simply cannot be done without a high degree of risk of injury.
 
 
 12
 Id.
 
 
 13
 Applying this language to the venting of natural gas, we will not say that it simply "cannot be done without a high degree of risk of injury." The record shows that these operations are routinely conducted on oil platforms without incident. As the plaintiffs showed here, if the gas had been vented away from the platform, where the gas would have had no place to accumulate and where no possible ignition source existed, these venting operations would have been performed without any risk. To paraphrase Kent, the activity of venting gas is likely to cause damage only when there is substandard conduct on someone's part.[2]
 
 
 14
 It is necessary to vent gas in order to conduct repairs on the pipeline which takes gas to the shore. In Kent, the court held that "the transmission of electricity over isolated high tension power lines is an everyday occurrence in every parish in this state and can be done without a high degree of risk of injury." Id. at 498-99. The transmission of natural gas has similar purposes and scope as the transmission of electricity. We would not subject this activity to strict liability without certain directions from the Louisiana courts.
 
 II. Strict Liability Under Article 2317
 
 15
 Plaintiffs next assert that the district court erred in not submitting a jury instruction on liability under article 2317 of the Louisiana Civil Code. We need not reach this issue, however, because the jury's finding of contributory negligence bars recovery under this theory, even if the district court erred in failing to give the instruction.
 
 
 16
 In Dorry v. Lafleur, 399 So.2d 559 (La.1981), the court dealt with the defense of contributory negligence (encompassed in the term "victim fault" in Louisiana jurisprudence) to a strict liability action under La.Civ.Code Ann. art. 2322 (West 1979). The case involved injuries to a consumer caused by a skating rink's defective roof. The court held that the fact that the cause of action was for strict liability did not automatically preclude the defense of contributory negligence. Instead, the court stated its use should be determined on a case by case basis. The court held:
 
 
 17
 Because the "ruined" building here housed a commercial enterprise to which plaintiff had paid the price of admission, we hold that in this case plaintiff's contributory negligence is not a defense to his claim.
 
 
 18
 Id. at 561. Although there have been contrary indications in both Louisiana and Federal decisions, our view of Louisiana law is now that contributory negligence can be advanced in strict liability actions under articles 2317 and 2322. Hyde v. Chevron U.S.A., Inc., 697 F.2d 614 (5th Cir.1983).
 
 
 19
 Plaintiffs argue however, based on the language in Dorry regarding the fact that the plaintiff had paid the price of admission and that the property produced income to the defendant, that since the metering station produced income for Columbia Gulf, contributory negligence should not be a defense. We think, however, that the plaintiff here is in a qualitatively different position from the plaintiff in Dorry. First, plaintiffs are not consumers but experienced owners and operators of drilling rigs. Second, the plaintiffs here derived a benefit from these metering facilities. They are engaged in the business of producing and selling oil and natural gas. These metering facilities were a necessity in order for plaintiffs to sell their production and receive an accurate count of the volume sold. Plaintiffs are not the innocent bystanders found in Dorry. Also, plaintiffs had substantial control of the placement of the metering station near the living quarters, and they were responsible for turning off the electrical devices when the venting operations commenced. Contributory negligence applies here and bars recovery under article 2317.
 
 III. Products Liability
 
 20
 Plaintiffs next assert that under Louisiana law, contributory negligence is not a defense to a products liability action, and the jury's finding that the metering station was defective means that the defendants are liable for products liability. While we have applied Louisiana law as not affording contributory negligence as a defense to a products liability action, Bell v. Jet Wheel Blast, Div. of Ervin Industries, 709 F.2d 6 (5th Cir.1983), defendants here are not subject to products liability.
 
 
 21
 Louisiana courts have required a manufacturer/user relationship in products liability actions. Weber v. Fidelity & Casualty Ins. Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971). The parties dispute whether Columbia Gulf can be considered a manufacturer. We pretermit this discussion because even if Columbia Gulf manufactured the metering station, it did not sell or lease the station or inject it into the stream of commerce.
 
 
 22
 This requirement originated in cases such as Greenman v. Yuba Powers Products Inc., 27 Cal.Rptr. 697, 59 Cal.2d 57, 377 P.2d 897 (1962), in which the court stated that a manufacturer of a defective product is strictly liable for "an article he places on the market." 27 Cal.Rptr. at 700, 377 P.2d at 900. This requirement has come to be known as the "stream of commerce" requirement. First Nat. Bank of Mobile v. Cessna Aircraft Co., 365 So.2d 966 (Ala.1978). It has been incorporated by the Restatement (Second) of Torts, Sec. 402A, which states that:
 
 
 23
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused ... if
 
 
 24
 (a) the seller is engaged in the business of selling such a product.
 
 
 25
 The rationale for this rule is easily explained by the policy behind the imposition of products liability on manufacturers. As Justice Traynor explained in Greenman,
 
 
 26
 The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.
 
 
 27
 27 Cal.Rptr. at 701, 377 P.2d at 901. If the defendant has not offered the product for sale, but kept it for his own purposes, then the justifications for strict liability do not apply.
 
 
 28
 It appears that Louisiana has, without much discussion, adapted this doctrine to its version of products liability. In Philippe v. Browning Arms Co., 395 So.2d 310, 318 (La.1980), the court said: "[t]he manufacturer of products introduced into commerce has the obligation to produce a product which is reasonably safe for its intended use." In addition, Louisiana law in the products liability area "has been described by commentators as closely approximating that of common law states following the Restatement (Second) of Torts Sec. 402A." De Battista v. Argonaut-Southwest Ins. Co., 403 So.2d 26, 30 (La.1981). The Restatement had adopted this business of selling requirement. In the case at bar, Columbia Gulf kept the station for its own purposes and did not inject it into the stream of commerce. Plaintiffs' products liability claim fails.
 
 IV. Last Clear Chance
 
 29
 Plaintiffs assert that the last clear chance doctrine applies and that their contributory negligence therefore does not bar recovery. Patin v. State Farm Insurance Co., 395 So.2d 466 (La.App.1981) sets out the elements of last clear chance:
 
 
 30
 (1) that he [the plaintiff] was in a position of peril of which he was unaware or from which he could not extricate himself,(2) that the defendant actually discovered or should have discovered his peril, and
 
 
 31
 (3) that after discovering the peril, the defendant had the opportunity to avoid the accident.
 
 
 32
 Id. at 468.
 
 
 33
 Plaintiffs do not satisfy the first criterion of this test. The evidence clearly shows that appellants knew of the risks involved in venting natural gas. Their foreman testified that it was good oil field procedure to shut down all possible sources of ignition, and that he shut down the electricity to other parts of the platform because he recognized that electricity was a potential source of ignition. Plaintiffs assert that they were not aware of their specific peril from the exhaust fan because one of the defendants' employees had noticed that the fan was running and did not tell them to turn it off. This is irrelevant, however, since appellants knew of the risk and could have easily extricated themselves by simply turning off all the electricity in the area. This is particularly true since plaintiffs were aware of the gas collecting under the heliport.
 
 
 34
 V. Defendants' Duty: To Protect Plaintiffs from their
 
 
 35
 Contributory Negligence?
 
 
 36
 Plaintiffs' last line of attack deals with whether defendants' duty extended to protecting plaintiffs against their own contributory negligence. We find that the defendants' duty does not extend nearly so far.
 
 
 37
 A few recent Louisiana cases have evolved a duty risk analysis in evaluating the extent of a defendant's duty. Rue v. State Department of Highways, 372 So.2d 1197 (La.1979); Boyer v. Johnson, 360 So.2d 1164 (La.1978); Baumgartner v. State Farm Mutual Automobile Ins. Co., 356 So.2d 400 (La.1978). Rue and Boyer were both cases in which a state statute imposed a duty on the defendant and the plaintiff was a member of the class protected by the statute. Since this case involves no similar statutory duties, Rue and Boyer are inapposite.
 
 
 38
 In Baumgartner, the court held that in a pedestrian/automobile accident, contributory negligence of the pedestrian was not a defense. The heart of the court's reasoning was that:
 
 
 39
 in motor vehicle-pedestrian cases there is lacking a "mutuality of risks." That is, the operator of a dangerous instrumentality, such as a motor vehicle, creates a great risk of injury to the life and limb of others. Thus he owes a duty to the public to protect it from that danger. The pedestrian, on the other hand, endangers himself only, therefore his duty is owed primarily to himself.
 
 
 40
 (footnotes omitted) 356 So.2d at 405. This case is a far cry from Baumgartner. There is no lacking of "a mutuality of risk" here. Both parties are engaged in different phases of the production of natural gas. They both have property and interests at stake in the venting of natural gas.
 
 
 41
 Also, in Baumgartner, the relationship between plaintiff and defendant was fortuitous. Here, however, the plaintiffs entered voluntarily into a relationship with defendants. They cooperated in the placement of the metering station on the platform and were responsible for turning off the power in order for the venting operations to be performed safely. In this context, we perceive no valid reason for making the duties of the defendants greater than those of the plaintiffs.
 
 
 42
 AFFIRMED.
 
 ON PETITION FOR REHEARING
 
 43
 Before GEE, REAVLEY and HIGGINBOTHAM, Circuit Judges.
 
 PER CURIAM:
 
 44
 In our original opinion we cited Bell v. Jet Wheel Blast, 709 F.2d 6 (5th Cir.1983) to have applied the Louisiana law as not affording contributory negligence as a defense to a products liability action. At rehearing of that case the question has been certified to the Louisiana Supreme Court. We intend to express no opinion contrary to the writing of Hyde v. Chevron U.S.A., Inc. 697 F.2d 614 (5th Cir.1983) or to draw a distinction between product liability and other forms of strict liability. That issue has no bearing on the judgment in the present case.
 
 
 45
 The petition for rehearing is DENIED.
 
 
 
 [1]
 The Outer Continental Shelf Lands Act, 43 U.S.C. Sec. 1331 et seq. is the jurisdictional basis for this suit. The Act also mandates that we apply state law as federal law, provided state law is not inconsistent with applicable federal law. Id. at Sec. 1333(a)(2)(A); Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). Accordingly, Louisiana law governs plaintiffs' suit
 
 
 [2]
 Appellant relies heavily on expert testimony that a spark could be caused by debris ejected by the pipeline. Yet if the debris is ejected from the platform, there is nothing for it to strike. If the spark is caused by the debris hitting the pipeline itself, the gas has not diffused enough with the oxygen in the atmosphere to make it combustible