John David ROMERO, et al.

v.

MOBIL EXPLORATION, et al.

Civ. A. No. 87–0972–L.

United States District Court,
W.D. Louisiana,
Lafayette Division.

Oct. 23, 1989.

**294**

Anthony D. Moroux, Moroux, Domengeaux & Davis, Lafayette, La., John G. DeRussy, DeRussy, Bezou & Matthews, New Orleans, La., Nathan A. Cormie, Terry O. Johnson, Lake Charles, La., Jennings B. Jones, Cameron, La., Wilford D. Carter, and L. Donald Foreman, Foreman & Canaday, Lake Charles, La., for plaintiffs.

R.K. Christovich, Christovich & Kearney, New Orleans, La., for Monsun Hydraulics.

Huntington B. Downer, Jr., Houma, La., for Patterson Services.

George H. Robinson, Jr., and Mark A. Lowe, Liskow & Lewis, Lafayette, La., for Mobil Exploration.

Gary P. Kraus, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, La., for Aries Marine.

Allen L. Smith, Jr., Plauche, Smith & Nieset, Lake Charles, La., for intervenors, Otis Engineering, Highlands Ins. and Ins. Co. of North America.

W. Seaborn Jones and Robert L. Todd, Hurt, Richardson, Garner, Todd & Cadenhead, Atlanta, Ga., and Patrick A. Juneau, Jr., Juneau, Hill, Judice, Hill & Adley, Lafayette, La., for Rexroth and Allianz.

## RULING

NAUMAN S. SCOTT, District Judge.

Before us is a Motion to Reconsider our Ruling of September 7, 1989 (the Ruling) (attached *Appendix A*) and a request to enter an order rescinding the Ruling. This Motion is filed by Rexroth Corporation (Rexroth) and is joined by plaintiffs Mary Alexander and Walter Thibodeaux (Movers). The Ruling granted summary judgment to Mobil Exploration and Producing North America, Inc. (Mobil).

■ Movers address their motion to those parts of our Ruling which held: (1) Mobil did not retain a right to exercise operational control over a snubbing procedure conducted on its fixed gas platform by snubbing contractor Otis Engineering Corporation (Otis); and (2) snubbing is not ultrahazardous as a matter of law. Generally, a principal is not vicariously liable for injuries sustained by employees of his independent contractor unless operational control exists or unless the activity is ultrahazardous. *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 549 (5th Cir.1987).

### I. *Ultrahazardous Activity*

■ To determine whether snubbing is ultrahazardous, we must compare it to activities previously held to be ultrahazardous and non-ultrahazardous. *Touchstone v. G.B.Q. Corp.*, 596 F.Supp. 805 (E.D.La. 1984) (citations omitted). Both the Fifth Circuit and the Louisiana Supreme Court have held that drilling is not ultrahazardous. *Ainsworth*, 829 F.2d at 550 (citations omitted). Because we find snubbing to be one particular form of drilling, we see no reason why we should oppose those courts which hold that drilling is not ultrahazardous. Thus, we find that snubbing is not ultrahazardous as it is in essence a drilling operation.

### II. *Operational Control*

■ In *Grammer v. Patterson*, 860 F.2d 639 (5th Cir.1988), the court explained that

"operational control only arises if the principal 'exercises direct supervision over the step-by-step process of accomplishing the work'." *Id.* at 643 (*quoting Guillory v. Conoco, Inc.*, 521 So.2d 1220, 1223 (La. App.Ct. 3d Cir.1988)). To properly decide this issue, we must determine what is meant by the phrase 'step-by-step supervision', and define the word 'work'.

We think that 'direct or step-by-step supervision' refers to the case where the principal substitutes the independent contractor's entire method and manner of operation for one of its own. *Wallace v. Oceaneering Int'l*, 727 F.2d 427 (5th Cir.1984). "It is not enough that [the principal] has merely a general right ... to prescribe alterations or deviations." *Restatement (Second) of Torts* § 414 comment c (1965). Quite simply, "[t]here must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." *Id.* Thus, the giving of specifications and the demand that certain operational standards be met is insufficient to hold that a principal has retained the right to exercise operational control. *Id.*

For example, in *Grammer v. Patterson*, 860 F.2d 639 (5th Cir.1988), the court held that the principal's instructions regarding alterations in the independent contractor's normal operating procedure did not amount to control over "how to" conduct the job. *Id.* at 645. When faced with the argument that the principal's instructions prohibited the independent contractor from "being entirely free to do the work in his own way," and thereby rose to the level of operational control, the court disagreed:

> Certainly Gator Hawk was not free to do any work it wished. Patterson's instructions expressly designated a new ... test which reflected a variation in Gator Hawk's normal tests.... However, Gator Hawk was free to, and did, *conduct* the testing in its own way.

*Id.* (emphasis added).

■ We think that "work" refers to the actual undertaking, and not to the preparatory, testing, or planning stages. We exclude those areas from our inquiry because we believe that a principal may exercise control over such matters. There is no question that a principal may specify "that which an independent contractor is to accomplish," *Grammer*, 860 F.2d at 645, and may monitor work progress and run field tests. *Guillory*, 521 So.2d at 1223.

■ Finally, we emphasize that the *right* to exercise control is the primary concern, and not whether actual control was exercised. *Smith v. Crown Zellerbach*, 486 So.2d 798, 801 (La.App.Ct. 1st Cir.), *writ denied*, 489 So.2d 246 (La.1986). Ordinarily, the right to exercise control is evidenced by the contract between the principal and the independent contractor. Here, no written contract exists. In the absence of a written contract, the best way to decide whether a right to exercise control exists is to examine the degree of control that was or could be exercised by the principal on this job and during past undertakings similar to the one at hand.

A. The Snubbing Guide

■ Movers argue that Mobil's Snubbing Guide (the Snubbing Guide) is a codification of Mobil policy which existed prior to and at the time of this accident. However, the Snubbing Guide was produced several months after the accident. Accordingly, Mobil argues that the Snubbing Guide is a subsequent remedial measure and therefore excluded from evidence under Fed.R. Evid. 407. Movers argue that the Snubbing Guide may be introduced as evidence under an exception to Rule 407 that would permit its introduction for the purpose of proving Mobil's control of the snubbing operation. Although we do not decide the issue at this time, we will assume for purposes of the motion now before us that the Snubbing Guide is permissible evidence and was in effect both before and at the time of the accident.

Section 3.1.8 of the Snubbing Guide, entitled "Work Basket and Control Panel," states:

> The (jack) operator must be able to monitor the hydraulic system pressure but must not have the capability to change it from the basket. Pressure changes can

only be made at the power pack after being approved by the Mobil and snubbing company supervisors.

Movers argue that instructions such as this create a factual dispute over whether Mobil retained the right to exercise direct supervision over the step-by-step process involved in snubbing jobs.

If viewed in isolation, we realize that such instructions may be construed as designating a "step-by-step" process for accomplishing the work. However, when viewed as a whole, the instructions of the Snubbing Guide unquestionably fail to reach that level.

▪ The preface of the Snubbing Guide states that while "[t]hese guidelines are to be used by engineering and operations personnel, *they do not replace the need for sound judgment by all individuals involved in snubbing operations. Mobil's first priority is the safety of all personnel involved in snubbing operations."* (emphasis added). Thus, the overall purpose of the Guide is to ensure that accidents are avoided. In this regard, we note that a principal demanding compliance with measures designed to ensure safety has not exercised the type of operational control required to shift liability. *See Smith,* 486 So.2d at 802. When read in light of the Snubbing Guide's overall purpose, the previously quoted passage does not imply control over the manner of performance, but rather refers to the danger which could result if the jack operator had unilateral control over the hydraulic pressure available to the jack:

> The pressure is controlled through a series of hydraulic regulators and dump valves.... One system allows the [jack] operator to select pump stages to regulate the hydraulic pressure and volume. The disadvantage of this system is that snubbers are tempted to select too many pump stages since jack speed depends on the volume of fluid available. *This results in excessively high hydraulic pressure available to the jack.* (emphasis added)

Without doubt, Mobil's alleged right to control this matter is designed to prevent excessive hydraulic pressure from being used. As we understand snubbing, excessive hydraulic pressure could cause an accident much like the one in the instant case. The other examples from the Snubbing Guide which Movers cite are similarly designed to ensure safety, such as: (1) approving the testing of snubbing units before snubbing begins; (2) providing an emergency escape route for workers in the basket, and requiring that workers in the basket wear fire resistent clothing; (3) ensuring that the blind/shear control be manned at all times during snubbing; and (4) demanding that the window guides be secured at all times.

In sum, the only conclusion is that the Snubbing Guide is not designed to give snubbing contractors directions on how to perform any aspect of the actual snubbing operation. Quite simply, the Guide concerns itself with how to prepare for a snubbing job so that accidents are avoided and so that Mobil personnel understand what the snubbing contractor is doing and can provide assistance where necessary.

## B. The Depositions

That Mobil did not retain the right to exercise operational control is also borne out by the depositions submitted by the parties. First, the only Mobil personnel on board the platform was supervisor Ruben Roy. Deposition of Nelson Burton Wright, p. 9. We note that Roy was rather inexperienced with snubbing. *See* Deposition of Ruben Roy. To exercise operational control, one must first have a solid knowledge of how to carry out the job. We find that Roy did not possess the knowledge necessary to have done so on this operation. Even if Roy did possess the requisite knowledge, we are not convinced that Mobil would have retained operational control over Otis.

Perry Courville, an Otis supervisor, describes the relationship with companies like Mobil to be one where the principal's responsibility was limited to providing information and assistance about downhole conditions and the well prognosis, rather than supervision of the details of the snubbing

operation: "I would like to have someone out there that knows what's downhole, what the objective is. If he thinks he knows the business of how our unit works better than we do, he'll get in the way of the operation." Courville Deposition, p. 28. In fact, if a principal attempts to intervene in the operation, Courville states that Otis will not permit it. Courville Deposition, p. 44. Finally, Louis Powers, the manager of Otis' Gulf Coast Region at the time of the accident, states that once the operation began the jack operator has control over everything in the basket, and the Otis' supervisor is in control of everything on the deck. Powers Supplemental Deposition, p. 134.

Movers argue that this characterization is incorrect. First, they point to the statement by Joe Meaux, the Otis supervisor on the job where the accident occurred, who stated that "everything we do is consulted back to the, you know, to the company representative." Meaux Deposition, p. 23. This statement refers, however, to *downhole* authority. As such, the authority exercised in that regard goes to the overall objective and it is within the principal's province to specify that which an independent contractor is to accomplish. *Grammer*, 860 F.2d at 645.

Similarly, Movers assert that Mobil engineers prepared detailed plans for each snubbing job and that Otis could not deviate from the plan without approval from Mobil. Magee Deposition, p. 102; Lewis Deposition, p. 75–77. However, Magee also states that "the procedures that are written, even though they are written in a step-by-step basis and they are written I guess in a logical sequence that the engineer sees that are necessary, *they are guides.* ... [S]hould there be any changes to that guide, the on-site supervisor can make them after consultation." Magee Deposition, p. 76 (emphasis added). We note here that it is not enough to shift liability if the principal can "make suggestions or recommendations which need not be necessarily followed." *Restatement (Second) of Torts* § 414 comment c. Moreover, we feel that a principal should be able to plan the entire operation and, in any

event, the plan used here does not indicate how to actually perform snubbing. It merely lists the snubbing operation as one facet of the entire kill procedure.

Next, Movers note that Thomas Lewis, David Durkee, Simon Guidry and Michael Magee, all Mobil personnel, state that they went into the work basket during previous snubbing operations. Lewis Deposition, p. 16–17; Durkee Deposition, p. 37–38; Guidry Deposition, p. 39–41; and Magee Deposition, p. 118–21. However, there is no indication that they attempted in any way to tell the snubbing contractor how to conduct its job. Even the fact that Durkee claims to have acted as a snubbing operator on a previous job is insufficient by itself to support a contention that Mobil could directly supervise a snubbing operation because once again there is no indication that Durkee attempted to instruct the snubbing operator.

Movers also point to the testimony of Nelson Burton Wright who, in response to a question about what is expected of Mobil's company man on a job, stated: "What we expect of my man on the job and the way we basically do our snubbing operations in written in the snubbing manual." Wright Deposition, p. 35. Movers assert that this statement implies operational control. We disagree because Wright later states that he does not expect Mobil's company man to supervise the snubbing operation as it is being conducted. Wright Deposition, p. 39.

Finally, Movers argue that Mobil company representatives insisted upon observing and approving the testing of the Otis snubbing units before snubbing began, *see* Counce Deposition, p. 46–50, and that Mobil's company representative had the right to control the positioning of Otis employee who controlled the remote blowout preventer during the snubbing operation. Magee Deposition, p. 110. These facts also fail to create operational control. We find that such demands are directed once again toward safety and therefore are permissible. *Smith*, 486 So.2d at 802.

■ In conclusion, we hold that in the absence of a written contract, we must look

to the actions of the parties to determine whether a right to exercise operational control is present. The Snubbing Guide does not provide any basis for the assertion that Mobil retained the right to exercise operational control because it is primarily concerned with safety and only explains how to prepare for snubbing rather than detailing a step-by-step process. The depositions of the parties similarly fail to create a basis for such an argument because there is no indication that Otis employees looked to Mobil for supervision. Movers would have us believe that any form of involvement by the principal creates a factual dispute sufficient to support a claim of operational control. We disagree. Instead, we believe that a principal may exercise authority provided that he does not retain the right to direct the actual operation.

Accordingly, Mover's Motion to Reconsider is DENIED.

## APPENDIX A

### RULING

Filed Sept. 8, 1989

Before us is a Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56(c) filed by defendant Mobil Exploration and Producing North America, Inc. (Mobil).

These consolidated lawsuits result from a blowout, explosion and fire on November 10, 1988, on a fixed natural gas platform owned by Mobil. Mobil's platform is located on the Outer Continental Shelf, in federal waters offshore from Louisiana. The blowout occurred during a snubbing [1] operation conducted by Otis Engineering Corporation (Otis) for the purpose of "killing" the well. Mobil had contracted with Otis because of the latter's expertise with snubbing.[2] Two Otis employees were killed, and one Otis employee and one Halliburton employee were injured as a result of the blowout.

Plaintiffs David Romero and Walter Thibodeaux and plaintiffs' survivors, Mary Alexander and D.A. Swiney (collectively plaintiffs) brought suit against Mobil, Otis and Rexroth Corporation (Rexroth).[3] Rexroth subsequently cross-claimed against Mobil.[4] Plaintiffs and Rexroth contend that although Otis is an independent contractor, Mobil is vicariously liable because it exercised operational control and because snubbing is ultrahazardous. Plaintiffs and Rexroth contend that Mobil is directly liable under Louisiana Civil Code articles 2317 and 2322 and for breaching sections 250.46 and 250.56 of Title 30 of the Code of Federal Regulations. We hold that Mobil did not exercise operational control and that snubbing is not ultrahazardous. Additionally, we find no liability under Civil Code articles 2317 and 2322 nor under the aforementioned sections of Title 30 of the Code of Federal Regulations. These claims will be addressed *in seriatim.*

Because the platform was located on the Outer Continental Shelf in federal waters, Louisiana law applies. *Rodrigue v. Aetna Casualty & Surety Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969); 43 U.S.C. § 1333(a)(2)(A). Under Louisiana law, a principal who employs an independent contractor is not liable for injuries sustained in the course of the contracted-for work by employees of that independent contractor unless (1) the principal has exercised operational control or (2) the work of the independent contractor involves ultrahazardous activity. *Ainsworth v. Shell Offshore, Inc.,* 829 F.2d 548, 549 (5th Cir.1987); *cert. denied,* 485 U.S. 1034, 108 S.Ct. 1593, 99 L.Ed.2d 908 (1988); *Hawkins v. Evans Cooperage Co., Inc.,* 766 F.2d 904, 906 (5th Cir.1985). The most important inquiry is

---

1. Snubbing involves forcing pipe into a well under pressure by means of hydraulic power.

2. No written contract existed between Mobil and Otis.

3. Other defendants in plaintiffs' action included Monsun, Patterson and Aries. Plaintiffs' claims against Patterson and Aries were subsequently dismissed. Another plaintiff, Alfred, dismissed

her claim against Patterson and has not contested Mobil's Motion for Summary Judgment.

4. Rexroth also cross-claimed against Otis, Aries, Patterson and Monsun. Summary judgment was granted for Otis and Aries in regard to Rexroth's cross-claims and Rexroth's cross-claim against Patterson has been dismissed.

whether the right to control the work is reserved by the principal. Not actual control but the right to exercise it. *Smith v. Crown Zellerbach*, 486 So.2d 798, 801 (La. App. 1st Cir.), *writ denied*, 489 So.2d 246 (La.1986) (*citing Hickman v. Southern Pacific Transport Co.*, 262 So.2d 385 (La. 1972)).

"Operational control does not arise unless the principal retains control over the methods and manner of performing the work." *Grammer v. Patterson*, 860 F.2d 639, 642 (5th Cir.1988). "It is not enough that the [principal] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendation which need not necessarily be followed or to prescribe alterations or deviations." *Id.* (quoting *Restatement (Second) of Torts* § 414 comment (c)). *See also Hickman*, 262 So.2d at 390. Moreover, a principal demanding compliance with all applicable safety codes is likewise insufficient evidence of operational control. *Smith*, 486 So.2d at 802.

Here, the facts submitted by the parties unquestionably show that Mobil did not retain the right to exercise operational control in the sense required by Louisiana law. Mobil merely retained the right to force Otis to shutdown if Mobil's supervisor observed unsafe activity and to have Otis fulfill its snubbing role in the overall "killing" process. Although Mobil could question the snubbing operator and may have retained a veto right over certain procedures untaken, "instructions which appear to impose operational control over a contractor's activities are at times more appropriately characterized as a principal's shorthand way of designating a desired outcome." *Grammer*, 860 F.2d at 645.

Whether an activity is ultrahazardous under Louisiana doctrine is a question of law. *Hawkins*, 766 F.2d at 907. An activity is ultrahazardous if (1) the work relates to land or some other immovable; (2) the work itself must cause the injury and the defendant must be engaged directly in the injury producing work; and (3) the work must not require substandard conduct to cause injury. *Id.* We need not consider the first two of these elements because we find that snubbing does not satisfy the third element. This element requires that the activity "can cause injury to others, even when conducted with the greatest prudence and care." *Kent v. Gulf States Utilities Co.*, 418 So.2d 493, 498 (La.1982). Thus, "if the activity can be conducted without a high degree of risk of injury by exercising due care, it is not ultrahazardous." *Hawkins*, 766 F.2d at 907 (citations omitted).

Plaintiffs contend that snubbing is akin to the storage of toxic gas and blasting with explosives, both of which are ultrahazardous under Louisiana law. *Kent*, 418 So.2d at 498. Mobil contends that snubbing is analogous to drilling activities for which "Louisiana courts routinely analyze personal injury ... cases ... under negligence principles." *Ainsworth*, 829 F.2d at 550 (citations omitted). We agree with Mobil. Further, we note that activities which also relate to the exploration of oil and gas, such as venting of natural gas, have not been held ultrahazardous. *See CNG Producing Co. v. Columbia Gulf Transmission Corp.*, 709 F.2d 959 (5th Cir.1983). Therefore, we hold that snubbing is not ultrahazardous as a matter of law,[5] and turn our attention to the contentions regarding direct liability.[6]

---

**5.** We note in passing that under Louisiana law judicial decisions such as this do not rest on factual evidence presented by the parties. *Touchstone v. G.B.Q. Corp.*, 596 F.Supp. 805 (E.D.La.1984). Rather, courts deciding whether an activity is ultrahazardous have based their decisions on a comparison with activities previously held to be ultrahazardous and non-ultrahazardous. *See O'Neal v. Int'l Paper Co.*, 715 F.2d 199 (5th Cir.1983) (per curiam); *Kent v. Gulf States Utilities Co.*, 418 So.2d 493 (La.1982).

**6.** Plaintiffs Thibodeaux and Swiney have, however, argued that the inquiry in this regard does not stop with a determination of whether snubbing is ultrahazardous. Pointing to two Louisiana Appeal Court cases, they contend that Louisiana courts also recognize the concept of "inherently dangerous" activities. *See, e.g., Thompson v. Petrounited Terminals, Inc.*, 536 So.2d 504 (La.App. 1st Cir.1988), *writ denied*, 537 So.2d 212 (La.1989); *Ewell v. Petro Pro-*

Plaintiffs first ground of direct liability regards Mobil's failure to comply with 30 C.F.R. §§ 250.46 and 250.56. However, in *Olsen v. Shell Oil Co.*, 561 F.2d 1178 (5th Cir.1977), the court held that violations of regulations promulgated by the Secretary of the Interior pursuant to OCSLA, 43 U.S.C. § 1334(a)(1), do not create civil causes of action beyond those provided by the LHWCA and applicable state law. Therefore, we hold as a matter of law that Mobil's alleged violations of these regulations do not create direct liability in this instance.

Next, plaintiffs assert that Mobil is liable under Louisiana Civil Code articles 2317 (strict liability) and 2322 (ruin). Strict liability is imposed under article 2317 when (1) the thing causing damage was in the defendant's custody; (2) the thing had a vice or defect; and (3) the vice or defect occasioned the plaintiff's damage. *Ainsworth*, 829 F.2d at 551; *Stewart v. Sun Wallace Indus. Co.*, 409 So.2d 335 (La.App. 1st Cir.1981), *writ refused*, 413 So.2d 497 (La.1982). Custody refers to supervision and control. *Grammer*, 860 F.2d at 642.

Mobil has contended throughout that a defective spring in the four-way directional valve in the Otis power pack was the cause of the blowout. It is uncontested that the power pack was owned by Otis and that the spring was manufactured by Rexroth and controlled the flow of hydraulic fluid. Plaintiffs do not contest the defective spring contention although Rexroth, of course, does reject it. Rather, plaintiffs and Rexroth rest their position on the same facts which they contend prove that Mobil exercised operational control over Otis regarding the independent contractor analysis. However, "supervision and control is not synonymous with operational control," *Grammer*, 860 F.2d at 642, and therefore,

these factual assertions are immaterial. Mobil, however, presents deposition testimony that Otis rigged, tested and operated the power pack without any form of supervision. Because plaintiffs and Rexroth have failed to controvert this evidence, Fed. R.Civ.P. 56(c) requires summary judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Similarly, none of the parties opposing Mobil's Motion for Summary judgment have proferred any facts which could show that Mobil is liable under Civil Code article 2322. Accordingly, Mobil is entitled to summary judgment on this issue under the *Celotex* standard.

Therefore, we GRANT summary judgment in favor of Mobil on all issues presented.

DONE AND SIGNED at Alexandria, Louisiana, this 7th day of September, 1989.

---

cessors of Louisiana, Inc., 364 So.2d 604 (La. App. 1st Cir.1978), *writ denied*, 366 So.2d 575 (La.1979). This doctrine holds that if work is inherently dangerous but can be made at least ordinarily safe if proper precautions are taken, a principal cannot escape liability "if he has expressly or impliedly authorized the particular manner which renders the work unsafe." Per-

kowski, *The Employer and the Torts of His Independent Contractor in Louisiana*, 21 Tul.L.Rev. 619, 626 & n. 41 (1947) (listing cases). Clearly, the threshold inquiry is whether snubbing is inherently dangerous. While snubbing is certainly dangerous, we decline to find it *inherently* dangerous finding it once again to be closely analogous to ordinary drilling operations.